Grace GUMZ, James Gumz,
Michael Gumz and Susan Gumz,
Plaintiffs-Respondents-Cross-Appellants,

v.

NORTHERN STATES POWER COMPANY
d/b/a Xcel Energy,
Defendant-Appellant-
Cross-Respondent-Petitioner.

Supreme Court

*No. 2005AP1424. Oral argument September 11, 2007.
—Decided December 6, 2007.*

2007 WI 135

(Also reported in 742 N.W.2d 271.)

264

For the defendant-appellant-cross-respondent-petitioner there were briefs by *Michael J. Happe, J. Drew Ryberg,* and *Ryberg & Happe,* S.C., Eau Claire, and *Jordan J. Hemaidan, John D. Wilson,* and *Michael Best & Friedrich LLP,* Madison, and oral argument by *J. Drew Ryberg.*

For the plaintiffs-respondents-cross appellants there was a brief by *Scott Lawrence* and *Lawrence & Des Rochers, S.C.,* St. Nazianz and *Gregory J. Cook* and *Greg Cook Law Offices S.C.,* Milwaukee, and *Kasdorf, Lewis & Swietlik, S.C.,* Milwaukee, and oral argument by *Scott Lawrence.*

An amicus curiae brief was filed by *Trevor J. Will, G. Michael Halfenger,* and *Foley & Lardner LLP,* Milwaukee on behalf of Wisconsin Public Service Corporation.

An amicus curiae brief was filed by *Lynn R. Laufenberg* and *Laufenberg & Hoefle,* Milwaukee, and *William C. Gleisner, III,* Milwaukee on behalf of Wisconsin Academy of Trial Lawyers.

An amicus curiae brief was filed by *O. Thomas Armstrong, William P. Croke,* and *von Briesen & Roper, S.C.,* Milwaukee on behalf of Wisconsin Electric Power Company.

An amicus curiae brief was filed by *H. Dale Peterson, John J. Laubmeier,* and *Stroud, Willink & Howard, LLC,* Madison on behalf of Wisconsin Farm Bureau Federation, Cooperative.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, Northern States Power Company ("Northern States"), seeks review of a published court of appeals decision affirming a judgment of the circuit court for Marathon County entered in favor of James, Grace, Michael, and Susan Gumz.[1] In this private nuisance action based on negligence, the Gumzs alleged that stray voltage from Northern States' distribution system caused damage to their dairy herd and also resulted in an invasion of and interference with the use and enjoyment of their property. After a jury trial, the circuit court entered judgment in favor of the Gumzs for damages in the amount awarded by the jury.

¶ 2. Northern States contends that the circuit court erred in the formulation of the special verdict. It asserts that the circuit court erroneously (1) failed to include a special verdict question asking whether the Gumzs commenced their lawsuit within the statute of limitations; (2) declined to give a special verdict question regarding whether the Gumzs were contributorily negligent in the management of their farm; and (3) refused to limit the damages only to those that occurred after Northern States had notice that stray voltage was harming the Gumzs' cows.

¶ 3. We conclude that the circuit court did not erroneously exercise its discretion in the formulation of the special verdict. Following precedent, we determine

---

[1] *See Gumz v. Northern States Power Co.,* 2006 WI App 165, 295 Wis. 2d 600, 721 N.W.2d 515, affirming a judgment of the circuit court of Marathon County, Gregory E. Grau, Judge.

that the circuit court did not err in failing to include in the special verdict a question addressing the statute of limitations. Based on the facts of this case, the circuit court correctly concluded as a matter of law that the Gumzs' action was not time barred because they had exercised reasonable diligence in discovering that stray voltage from Northern States' distribution system was a cause of damages to their herd.

¶ 4.  We also determine that the circuit court did not err in declining to give Northern States' proposed special verdict question regarding whether the Gumzs were contributorily negligent in the management of their farm. Finally, we determine that the circuit court appropriately allowed damages to be awarded for the period before Northern States had notice that stray voltage from its distribution system was harming the Gumzs' cows. Accordingly we affirm the court of appeals.

I

¶ 5.  In 1981 James and Michael Gumz purchased a dairy farm from their parents, who had farmed at the location for many years. Northern States owns the electrical distribution system that serves the Gumzs' farm. Approximately the last mile of Northern States' distribution line to the farm consists of the original Copperweld conductor wire installed in 1937.

¶ 6.  Around 1991, the Gumzs began to notice behavioral and physical problems with their herd. The cows showed signs of increased aggravation, "jumping" and "stepping around" during milking. The problem got worse over the next three years. The cows stopped drinking normally and appeared hesitant to drink out of their drinking cups. They exhibited nervous tail twitching and "dancing" (lifting their feet off the

ground) during milking. The herd did not breed successfully enough to maintain its size, and milk production suffered.

¶ 7. In 1992 the Gumzs consulted their herd nutritionist, Dwight Tolk, regarding the health of their cows. Tolk observed that the cows did not come to the barn easily, walked stiff-legged, were thin, seemed sluggish, and did not lay down much. He monitored their behavior and worked with their nutrition. By approximately the summer of 1993 Tolk had ruled out the possibility that the problems were due to nutrition. Instead he believed that some "outside phenomenon . . . was causing the cows to be stressed and uncomfortable." He suggested to the Gumzs that the problem was due to stray voltage.

¶ 8. From 1994 through 1996 the Gumzs continued to work to improve the health of their herd. In the fall of 1994, the Gumzs began using Dr. Theresa Peterson as their primary herd veterinarian. Dr. Peterson testified that she was aware of some of the behavioral and health problems in cows that can result from exposure to stray voltage. However, she recommended that the Gumzs engage in a process of elimination of other causes before initiating testing for stray voltage. She testified that "I try to rule other things out before I get to the point of thinking about requesting electrical testing."

¶ 9. Around the same time they hired Dr. Peterson, the Gumzs also sought help for the herd's problems by hiring Rick Guralski to be the nutritionist for their milk cows. Tolk continued to work with the Gumzs' heifers.

¶ 10. Consistent with suggestions, the Gumzs tried to address the problems by changing their farming practices. They changed milking equipment, installing

automatic take-off devices for their milking machines. The Gumzs also tried using different feeds and feed mills. In 1994, they switched to a new total mixed ration system designed to improve their feeding methods. An electrician who wired the barn addition for the ration system also checked the farm's wiring at that time. He determined that it was in good condition.

¶ 11.  Despite these efforts the herd continued to deteriorate. At trial, Dr. Peterson testified that in late 1995 and 1996 she observed numerous health problems, including poor body condition, feet and leg problems, infections and mastitis, pneumonia, and weakened immune systems.

> The cows had poor body condition, a lot of feet and leg problems. They started to look crippled. They had problems getting up, walked very slow, were lame, limping around. A lot of infections started, like mastitis outbreaks, . . . where the cow would become physically sick, and, without treatment, would go down and die. There was quite a bit of pneumonias at that time. A few uterine infections or nutritis cases. So their immune systems were becoming weakened.

In addition, she observed that there were numerous abortions and the herd had a poor fertility rate.

¶ 12.  Dr. Peterson further testified that the problems with the Gumzs' herd were more difficult to alleviate than in other herds, and recently purchased animals that were healthy and vaccinated would get sick when they came to the Gumzs' farm. She ordered testing on blood and tissue but was still unable to isolate a particular disease causing the herd's problems.

¶ 13.  In early 1996, after eliminating other potential causes, Dr. Peterson suggested to James Gumz that the farm be tested for stray voltage. On May 6, 1996, Dr. Peterson wrote a letter to Northern States listing the

herd's health problems and stating her opinion that the problems were due to stray voltage.

¶ 14. Later in May 1996, she prepared a report detailing the herd's health problems and her efforts to determine the cause of those problems. She described the management practices at the Gumzs' dairy farm as "above average," and stated that those practices "should allow a herd to remain healthy, produce quality milk, and have good production records." Ultimately Dr. Peterson concluded that the problems were not due to poor management, nutrition, or a specific disease. Rather, she stated that the poor health and performance of the herd were due to stray voltage and recommended that the farm be tested.

¶ 15. Consistent with Dr. Peterson's suggestion, the Gumzs had their farm checked for stray voltage by Northern States on May 7, 1996, and by an independent electrician, John Ritchie, on May 14, 1996. Northern States' tests showed that the "cow contact voltage" was below the "level of concern." Using different testing equipment, Ritchie found much higher levels of voltage flowing onto the farm and determined that it was coming from off-farm.

¶ 16. Upon Ritchie's recommendation, the Gumzs installed an isolation transformer. After installing the device, the herd improved. Fewer animals died, the herd's food consumption improved, and the overall herd health increased.

¶ 17. In 1998 and 1999, the herd's health began to decline again. The Gumzs again asked Northern States to test for stray voltage, and again Northern States did not find voltage over the level of concern. They then hired another independent electrician, David Stetzer. Stetzer provided the Gumzs with equipment that monitored voltage on the barn floor. Measurements taken

with that equipment indicated that as voltage decreased, milk production increased, and as voltage increased, milk production decreased.

¶ 18. On December 21, 2001, the Gumzs filed suit against Northern States for damages resulting from stray voltage from Northern States' system. Northern States moved for summary judgment on the ground that the Gumzs had not filed suit within the six-year period of limitations imposed by Wis. Stat. § 893.52.[2] The circuit court denied the motion.

¶ 19. The case was tried to a jury. The Gumzs' causation expert testified that exposure to stray voltage had a substantial adverse effect on the herd's production. An agricultural economist testified that the total economic damages due to lost productivity were $901,183.

¶ 20. An expert for Northern States testified that the estimates of productivity adduced by the Gumzs were unrealistic, and maintained that the Gumzs' productivity levels were likely due to a variety of factors, not just stray voltage. He testified that there were a number of ways in which the herd was managed that likely harmed productivity. These included problems with herd nutrition, inconsistent feeding, inadequate biosecurity and disease prevention, and animal discomfort.

¶ 21. The jury found that Northern States was negligent with respect to the electrical service or facilities it provided to the Gumzs, and that Northern States' negligence caused damages attributable to harmful levels of electricity. It also found that Northern States' negligence caused damages to the Gumzs due to inva-

_____

[2] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

273

sion of or interference with the use and enjoyment of their land. It awarded the Gumzs total damages of $532,336.

¶ 22.   The circuit court entered judgment in favor of the Gumzs, and Northern States appealed. The court of appeals affirmed, and Northern States petitioned for review.

## II

¶ 23.   This case requires that we address whether the circuit court erroneously exercised its discretion in the formulation of a special verdict. A circuit court has wide discretion in determining the words and form of a special verdict. *Hannemann v. Boyson*, 2005 WI 95, ¶ 30, 282 Wis. 2d 664, 698 N.W.2d 714. We will not disturb a circuit court's determination unless the court has erroneously exercised its discretion.

¶ 24.   A court erroneously exercises its discretion if the special verdict questions fail to cover all issues of fact or are inconsistent with the law. *Estate of Hegarty v. Beauchaine*, 2006 WI App 248, ¶ 46, 297 Wis. 2d 70, 727 N.W.2d 857. Whether a special verdict reflects an accurate statement of the law applicable to the issues of fact in a given case presents a question of law that we review independently of the determinations rendered by the circuit court and the court of appeals. *Id.*

## III

¶ 25.   We turn first to Northern States' statute of limitations argument. The period of limitations for the Gumzs' lawsuit is governed by Wis. Stat. § 893.52. It

274

provides that an action to recover for injury to property "shall be commenced within 6 years after the cause of action accrues or be barred . . . ."[3] This court adopted the discovery rule in *Hansen v. A.H. Robins, Inc.*, 113 Wis. 2d 550, 335 N.W.2d 578 (1983). Under the discovery rule, tort claims "accrue on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first." *Id.* at 560. Actions for negligence in stray voltage cases are subject to the discovery rule. *Kolpin v. Pioneer Power & Light Co.*, 162 Wis. 2d 1, 27, 469 N.W.2d 595 (1991).

¶ 26. Accrual requires that plaintiffs discover, or with reasonable diligence should have discovered, "not only the fact of injury but also that the injury was probably caused by the defendant's conduct . . . ." *Borello v. U.S. Oil Co.*, 130 Wis. 2d 397, 411, 388 N.W.2d 140 (1986). Plaintiffs can rely on the discovery rule only if they have exercised reasonable diligence in the discovery. *Spitler v. Dean*, 148 Wis. 2d 630, 638, 436 N.W.2d 308 (1989).

¶ 27. Northern States maintains that there is a question of fact as to whether the Gumzs exercised reasonable diligence in discovering that stray voltage from Northern States' distribution system was the cause of damage to their herd. It argues that under the discovery rule, there is a question of fact as to whether the Gumzs' action is barred by the statute of limita-

---

[3] Wisconsin Stat. § 893.52 provides in full:

Action for damages for injury to property. An action, not arising on contract, to recover damages for an injury to real or personal property shall be commenced within 6 years after the cause of action accrues or be barred, except in the case where a different period is expressly prescribed.

tions. Northern States therefore claims that the circuit court erred in not providing a separate special verdict question regarding whether the Gumzs knew, or with reasonable diligence should have known or discovered, that electricity from Northern States caused damage to the dairy herd by December 21, 1995, six years before the Gumzs commenced this action.

¶ 28. We disagree. The statute of limitations question falls squarely within the scope of *Kolpin* and *Allen v. Wisconsin Public Serv. Corp.*, 2005 WI App 40, 279 Wis. 2d 488, 694 N.W.2d 420.

¶ 29. Like the present case, *Kolpin* involved the application of the discovery rule in a lawsuit for damages to a dairy herd caused by stray voltage. 162 Wis. 2d at 7–8. In March 1977 the Kolpins first noticed behavioral problems in their herd, including refusing to enter the milking parlor, poor eating and drinking, increased milking time, and a dramatic increase in mastitis. *Id.* at 11.

¶ 30. The Kolpins consulted their veterinarian and had experts check their equipment, but they did not find any problems. In 1980, after reading about stray voltage in a magazine, Mr. Kolpin and an electrician checked for voltage in the milking parlor. Although they found voltage, they did not know what the readings meant. *Id.* at 12. Mr. Kolpin then contacted the utility company, Pioneer, which sent a representative who did not know how to measure for stray voltage. Shortly after, a representative of the Public Service Commission took voltage readings on the farm, but did not communicate the results to the Kolpins. *Id.* at 12–13.

¶ 31. The Kolpins made some changes to electric motors and circuitry suggested by the Public Service Commission representative, and Pioneer made changes in its system that led to a drop in voltage in the Kolpins'

276

barn. However, the herd's problems did not abate. *Id.* at 13. In 1983, the Kolpins hired an electrical contractor to install a grounding device, after which the herd's behavior and milk production returned to normal. The Kolpins filed suit against Pioneer in 1987. *Id.* at 14.

¶ 32. The case was tried to a jury, which found Pioneer liable for damages. *Id.* at 15. The jury also answered "yes" to a special verdict question asking whether the Kolpins knew, "or should they with the exercise of reasonable care have known, prior to February 17, 1981, that Pioneer's electrical distribution system was a cause of damage to their dairy operation?" *Id.*

¶ 33. On review, this court concluded that the jury's answer to the question of discovery should be changed as a matter of law. Relying on *Borello,* 130 Wis. 2d 397, the court determined that for the Kolpins' action to accrue, "they must have objectively known, at that time, the cause of their injuries and Pioneer's part in that cause." *Kolpin,* 162 Wis. 2d at 25–26.

¶ 34. The court recognized that by 1980 Mr. Kolpin knew of the possibility of stray voltage, had discovered voltage readings on his farm, and had a hunch that stray voltage was his problem. However, it was not until the Kolpins installed the grounding device and the herd improved that the Kolpin's "objectively knew that Pioneer's distribution system, and not their own farm operation, was the cause of their problem." *Id.* at 26. Because of the difficulty of identifying the cause of stray voltage, "[t]he 'discovery' was more of a process of elimination of possible causes rather than a process of determination of the cause." *Id.* at 27. The court therefore concluded that as a matter of law, the Kolpins neither discovered nor with the exercise of reasonable care should have discovered, prior to February 17, 1981, that stray voltage from Pioneer's distri-

bution system was the cause of the damage to their herd. *Id.*

¶ 35.   The court of appeals recently applied *Kolpin* to another stray voltage action in *Allen*, 279 Wis. 2d 488. The plaintiff in *Allen* first experienced problems with his dairy herd in 1976. He suspected stray voltage by 1988 and asked Wisconsin Public Service Corporation (WPS) to check his farm. WPS did not discover any stray voltage. *Id.*, ¶ 3. Between 1984 and 1997, Allen worked with nutritionists, purchased a new mixer feed wagon, and installed a new milking parlor. However, the problems persisted. *Id.*, ¶ 13.

¶ 36.   In 1997 Allen hired an electrician who concluded that stray voltage from WPS was present on the farm. *Id.*, ¶ 5. WPS again checked the farm, but it could not find the stray voltage. *Id.* Also in 1997, Allen installed an isolation unit, which improved production for just a few days. *Id.* The following year, he installed a different isolation unit, and herd behavior and production finally improved. *Id.*, ¶ 14. Allen filed suit in November 2000. *Id.*, ¶ 7.

¶ 37.   WPS argued that Allen's claims were barred by the statute of limitations. It maintained that had Allen acted with reasonable diligence, he would have discovered that stray voltage from WPS was the cause of his problems more than six years prior to the date he filed the lawsuit. *Id.*, ¶ 9. Relying on *Kolpin,* the court of appeals determined that Allen exercised reasonable diligence because he went through a reasonable process of elimination to find the source of the problem. *Id.*, ¶ 16. Thus, it concluded that Allen "did not know nor could he have known through reasonable diligence that WPS was the cause of the herd's problems" until the isolation unit was installed and herd health improved in 1998. *Id.*, ¶ 12.

¶ 38. In the present case, the circuit court followed the reasoning in *Kolpin* and *Allen*.[4] In its decision on Northern States' motion for summary judgment, the court described the Gumzs' efforts to "root out the cause of the problems" prior to 1996 as a "process of elimination" similar to that of the plaintiffs in *Kolpin*. Accordingly, it determined that the Gumzs "exercised reasonable diligence in determining the cause of their injuries and the defendant's role in that cause." Further, it concluded that the cause of action did not accrue until 1996, when the farm was tested for stray voltage and the Gumzs installed the isolation transformer.

[4] The dissent distinguishes the present case from *Kolpin* and *Allen* on the ground that "[u]nlike the plaintiffs in [*Kolpin* and *Allen*], the Gumzs failed to contact the utility until long after they had concerns about stray voltage." Dissent, ¶ 85. However, it is unclear when the dissent believes that the Gumzs actually suspected that their problem was due to stray voltage. It is also unclear how the dissent has come to a conclusion about how long it was after having concerns about stray voltage that Allen contacted the utility. *See* dissent, ¶ 88. The opinion states only that Allen first experienced problems in 1976 and that "by 1988" he suspected stray voltage. *Allen v. Wisconsin Public Serv. Corp.,* 2005 WI App 40, ¶ 3, 279 Wis. 2d 488, 694 N.W.2d 420. It says nothing whatever about whether he suspected stray voltage as early as 1976.

The dissent also contrasts this case with *Kolpin* and *Allen* on the ground that the plaintiffs in those cases "asked the utility to test for stray voltage as part of the process of elimination, [and i]n those cases, the utility's testing indicated the farmer had no excess stray voltage from off-farm sources." Dissent, ¶ 85. Yet the Gumzs too asked the utility to test for stray voltage as part of the process of elimination, and as in *Kolpin* and *Allen* "the utility's testing indicated ... no excess stray voltage from off-farm sources." We therefore do not see the distinctions between the present case and prior stray voltage cases that the dissent seeks to draw.

279

¶ 39. At the jury instruction conference the circuit court reiterated its view regarding the plaintiffs' reasonable diligence. Northern States requested a special verdict question asking "Did the Gumzs know or with reasonable diligence should they have known or discovered that electricity from [Northern States] was a cause of damage to their dairy herd by December 21st, 1995?" The court recounted the Gumzs' efforts to pinpoint the cause of the problems and determined as a matter of law that they had exercised reasonable diligence. It also noted that, similar to *Allen,* Northern States had conducted tests but was unable to find the stray voltage. The court therefore concluded that under *Kolpin* and *Allen* the special verdict question addressing the statute of limitations should not be given.

¶ 40. Northern States contends that the Gumzs failed to exercise reasonable diligence because they were alerted to the possibility that stray voltage was a cause of damage in 1993, but failed to test for stray voltage until 1996. This argument misses the mark.

¶ 41. The Gumzs were advised about the possibility of stray voltage by their nutritionist, Dwight Tolk. At the time Tolk suggested stray voltage, there were still many possibilities to be eliminated before they would know that stray voltage from Northern States was causing the problems. The Gumzs exercised reasonable diligence in ruling out the other possibilities. Declining to follow the advice of a single non-expert in such circumstances does not demonstrate a failure to exercise reasonable diligence.[5]

---

[5] The dissent is incorrect that this paragraph implies "that an expert opinion is required for discovery to occur . . . ." Dissent, ¶ 89 n. 5. The question at hand is reasonable diligence,

¶ 42. Northern States also urges this court to examine the court of appeals decision insofar as it based its statute of limitations determination on the answer to a special verdict question pertaining to negligence. In *Allen,* the court of appeals offered two rationales for its conclusion that the plaintiff exercised reasonable diligence in investigating his herd's problems. First, as discussed above, the court determined that under *Kolpin,* Allen exercised reasonable diligence as a matter of law. 279 Wis. 2d 488, ¶ 16.

¶ 43. In addition, the court determined that the jury instruction and special verdict had adequately addressed the issue. The jury instruction stated:

> The failure to exercise ordinary care to discover an unsafe electrical condition on the farm, even if it does not involve his own equipment, can also be negligence. However, if the defective electrical condition on the farmer's equipment or facilities is such that it was not known or would not have been discovered by the exercise of ordinary care, the farmer is not negligent in permitting it to exist in such condition.

*Id.,* ¶ 17. The special verdict asked whether Allen was "negligent in the use of electricity on his farm," to which the jury answered "no." *Id.*

¶ 44. The court of appeals reasoned that for the jury to reach its conclusion, it would have to have determined that Allen exercised ordinary care to discover an unsafe electrical condition on his farm, as per the jury instruction. *Id.* Thus, the court concluded, the jury had in effect answered the question of whether Allen had exercised reasonable diligence with respect to the discovery rule and the statute of limitations. *Id.*

---

not discovery. *See* ¶ 55 n. 7; *Schmidt v. Northern States Power,* 2007 WI 136, ¶ 3 n.5., ___ Wis. 2d ___, 742 N.W.2d 294.

¶ 45. In the present case, the jury was given a similar instruction, followed by special verdict question 3, which asked whether the Gumzs were "negligent in the use and/or discovery of electricity on the farm." As in *Allen,* the jury answered the question "no." Following *Allen,* the court of appeals concluded that the instruction and special verdict question "effectively asked whether the Gumz[s] acted with reasonable diligence." 295 Wis. 2d 600, ¶ 13.

¶ 46. The court of appeals' approach in *Allen* and in this case is problematic. It infers that an answer to a negligence special verdict question provides an answer to a statute of limitations special verdict question. In *Allen,* the answer to whether the plaintiff was negligent in the "use" of electricity does not provide an answer to whether the plaintiff was negligent in the discovery of electricity.

¶ 47. With respect to the present case, the special verdict question asking whether a plaintiff was "negligent in the use and/or discovery of electricity" asks three questions: (1) is the plaintiff negligent in the use of electricity, (2) is the plaintiff negligent in the discovery of electricity, and (3) is the plaintiff negligent in both the use and discovery of electricity?

¶ 48. Here, the jury answered the special verdict question "no," which implies a negative answer to each of the three sub-questions. However, if the jury had answered the special verdict question "yes," it would have been unclear which of the three sub-questions the jury was addressing. That is, the jury could have answered "yes" to the special verdict question because the plaintiff was negligent in the use of electricity, in the discovery of electricity, or in both the use and discovery of electricity. Thus, an affirmative answer to the special verdict question here does not necessarily

provide an answer to the question of whether the plaintiff was negligent in the discovery of electricity.[6]

■

¶ 49.  Statute of limitations defenses based on failure to exercise reasonable diligence will often present questions of fact appropriate for a jury. When they do, courts should provide separate questions for negligence and reasonable diligence in discovery. To the extent that *Allen* and the court of appeals decision in this case imply otherwise, they are incorrect.

¶ 50.  In the present case, however, the circuit court did not include special verdict question three to determine whether the Gumzs exercised reasonable diligence in discovering electricity. Rather, it determined as a matter of law that they exercised reasonable diligence and that the action was not time barred. Having determined the statute of limitations question as a matter of law, there was no need to include such a question in the special verdict.

¶ 51.  The circuit court's analysis is correct. The Gumzs were as diligent in their efforts to learn the cause of their herd's problems as the plaintiffs in *Kolpin* and *Allen*. They worked with different nutritionists, tried different feeds, and changed feeding systems. They changed milking equipment. They had an electrician check the barn's electrical system to see if it was the cause of problems. They sought the help of Dr. Peterson, who looked for underlying diseases.

¶ 52.  After ruling out these possibilities, the Gumzs had Northern States and another specialist

---

[6] Because we determine as a matter of law that the Gumzs exercised reasonable diligence, we need not address the question of whether the special verdict question provides an answer to the statute of limitations question in the present case.

check for stray voltage. They installed an isolation transformer when a single test indicated that stray voltage from Northern States was present. Because the herd's health improved after the installation of the isolation transformer, the Gumzs were finally able to pinpoint the cause of the problems.[7]

¶ 53.   As in *Kolpin,* the Gumzs' discovery "was more of a process of elimination of possible causes rather than a process of determination of the cause." 162 Wis. 2d at 27. Further, the Gumzs' efforts constitute "a reasonable process of investigating the cause of [their] problems by eliminating other possible causes." *Allen,* 279 Wis. 2d 488, ¶ 16.

¶ 54.   Also like *Kolpin,* the Gumzs did not have objective knowledge that stray voltage from Northern States was a cause of damages to their herd until the herd improved upon the installation of the isolation transformer in 1996. *See Kolpin,* 162 Wis. 2d at 27. Further, similar to *Allen,* the defendants had the opportunity to discover the stray voltage on the Gumzs' farm. Their inability to do so is at odds with the claim that with reasonable diligence the Gumzs should have known that stray voltage was a cause of damages.

¶ 55.   In sum, we determine as a matter of law that the Gumzs exercised reasonable diligence. Prior to

---

[7] The dissent states that we "seem[] to create or approve of a bright-line rule that discovery cannot occur in a stray voltage case until the farmer finds a remedy for the stray voltage problem." Dissent, ¶ 91. We do not create such a bright-line rule. Rather, the rule for discovery remains the rule enunciated in *Borello v. U.S. Oil Co.,* 130 Wis. 2d 397, 388 N.W.2d 140 (1986). However, under the facts of this case, it was not until a remedy was found for the problems that it could be determined that "the injury was probably caused by the defendant's conduct . . . ." *Id.* at 411.

May 1996 the Gumzs did not know, nor with reasonable diligence should they have known, that stray voltage from Northern States was a cause of damages to their herd. Accordingly, we determine that the circuit court did not erroneously exercise its discretion in declining to include a special verdict question concerning the statute of limitations.[8]

---

[8] Here, we affirm the circuit court's determination that there is no question of fact with respect to the statute of limitations question. However, another case involving discovery of stray voltage, *Schmidt v. Northern States Power*, 2007 WI 136, __ Wis. 2d __, 742 N.W.2d 294, is also released today. In *Schmidt* we reverse the circuit court's determination that there is no question of fact with respect to the statute of limitations question. The apparent difference stems from the different aspects of the discovery rule involved and the factual differences in the cases.

Under the discovery rule, tort claims "accrue on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first." *Hansen v. A.H. Robins, Inc.*, 113 Wis. 2d 550, 560, 335 N.W.2d 578 (1983). In the present case, the date of actual discovery is not at issue. Rather, the issue is whether the Gumzs exercised reasonable diligence. For the reasons outlined in the text, we determine that as a matter of law the Gumzs exercised reasonable diligence.

In contrast, whether the Schmidts exercised reasonable diligence is not at issue. Rather, the issue is when they actually discovered that stray voltage from Northern States was causing problems to their herd.

Moreover, there are important factual differences between the Gumzs' and the Schmidts' actions in discovering stray voltage and its link to damages to their respective herds. The Gumzs began their process of elimination by looking for problems in nutrition, machinery, farming practices, personnel, disease, and on-site electricity before narrowing the cause of their problems to Northern States' lines. That process was reasonable, and did not result in isolating the source of the

¶ 56. We consider next Northern States' contributory negligence argument. Northern States contends that the circuit court erred by framing a special verdict question that was limited to the Gumzs' negligence "in the use and/or discovery of electricity on the farm." It argues that it was entitled to a broader question of whether the Gumzs were "negligent in the operation, maintenance or management of their dairy enterprise."

¶ 57. At the jury instruction conference Northern States asserted that a negligence question limited to electricity was too narrow. It maintained that the case is primarily about all of the Gumzs' lost productivity, that the Gumzs' management of the farm was negligent, and that their negligence contributed to their overall lost productivity. In contrast, the circuit court determined that the case is about damage caused by stray voltage. The court explained its position as to the form of the question as follows:

---

problem as electricity from Northern States until they installed the isolation transformer in 1996.

In contrast, the Schmidts looked at electricity problems early in their process of elimination. They had Northern States check for stray voltage multiple times, installed plastic water tanks, attached rubber tires to their feed bunks, had an electrician test the farm, sought test results from Northern States' monitors, and installed a device to isolate their herd from stray voltage. *Schmidt,* ___ Wis. 2d ___, ¶¶ 6–19. The question is whether the improvement in herd health after the installation of the equipotential plane, which occurred more than six years prior to suit being filed, constitutes an objective basis for a belief that the stray voltage was the cause of damage to the Schmidts' herd. No such question exists in the present case, for the isolation device in the present case was installed less than six years prior to the Gumz filing suit.

It seems to me that where this case is at is there is the argument that the electrical services and facilities have caused damage, and in large part the defense is that it was not the electrical services or facilities that caused the damages, rather it was a litany of things . . . . The number of cows, lactation, history, the management of the herd, genetics, feed, water intake, herd health, mastitis, and perhaps other things. But that captures the essence of a significant part of the defense put forward. And it seems to me that the jury is going to be asked to answer what, if any, damage electricity caused, and certainly the defense is free to argue that there was none, or it was minimal. It was all of these factors.

¶ 58. The court emphasized that the defense could argue that any damages sustained were caused by the Gumzs' negligent operation of the farm and not by stray voltage:

[M]y ruling on that is that the issue in this case is damages that were caused, if any, by electricity — and the defense can argue from a cause standpoint that the electricity didn't cause any damage or was minimal and these other factors went into it, but in terms of contribution, I'm not instructing that those other factors that we've talked about earlier can enter into a determination as to contribution. It's just the Gumzs' responsibility concerning the electricity that figures into the contribution.

. . . .

I think you can still explore your theory, argue your theory that electricity didn't cause these damages, that something else did, and you reinforce to the jury that the only thing that the plaintiffs can recover for . . . are damages caused by the negligent service or facilities provided relative to electricity.

¶ 59. The circuit court's reasoning is reflected in the negligence questions in the special verdict, which

concern negligence regarding electricity and electrical service. The special verdict provides in relevant part:

Question 1: Was Northern States Power Company negligent with respect to the electrical service or facilities which it provided to the Gumz farm?

[Jury answered "Yes."]

. . . .

Question 2: If you answered Question 1 "yes," then answer this question: Was this negligence a cause of damages, attributable to harmful levels of electricity, to the Gumzs?

[Jury answered "Yes."]

Question 3: Were the Gumzs negligent in the use and/or discovery of electricity on their farm?

[Jury answered "No."]

Question 4: If you have answered Question 3 "yes," then answer this question: Was the Gumzs' negligence a cause of damages, attributable to harmful levels of electricity, to the plaintiffs?

[Jury did not answer.]

. . . .

Question 7: If you have answered Questions 2 and 4 "yes," then answer this question: Assuming that the total cause of damages attributable to harmful levels of electricity is 100 percent, what percentage of the causal negligence which you have found do you attribute to:

A. Northern States Power Company ____%

B. The Gumzs                        ____%

288

[Jury did not answer.]

With respect to damages, the special verdict explicitly limited the potential damages to those resulting from electricity:

Question 8: What sum of money will fairly and reasonably compensate the Gumzs *for damages attributable to harmful levels of electricity* as to:

A: Lost milk production [Jury answered $249,086.]

B. Loss of fair market value to their dairy herd [Jury answered $33,250.]

C. Excess costs [Jury answered $50,000.]

. . . .

D. For annoyance, inconvenience, and loss of use and enjoyment of their real property [Jury answered $200,000.]

(Emphasis added.)

¶ 60. The jury instruction also was explicit that damages could be awarded only for harms due to electricity. The instruction provides in relevant part:

As to [special verdict questions] 8A, 8B and 8C,

If you are satisfied that plaintiffs have in the past experienced damages because their dairy herd was exposed to harmful levels of *electricity,* you shall award such sum of money as will reasonably compensate plaintiffs for the loss attributable *only to that electricity.* You cannot award any damages for any condition of the Gumzs' herd except insofar as you are satisfied that the herd's condition has been aggravated by *harmful levels of electricity.* If you find that the plaintiffs had a condition which was aggravated *because of harmful*

289

*levels of electricity,* then you should include an amount which will fairly and reasonably compensate the plaintiffs for such damages the plaintiffs suffered as a result of such aggravation.

Any damages that the plaintiffs may have suffered, or have, which is not the natural result of *harmful levels of electricity,* is not to be considered by you in assessing damages. You cannot award damages for any condition which has resulted from consequences which are attributable to causes other than *harmful levels of electricity.* . . .

If livestock has been damaged, and the injury to the livestock has ceased, the compensation to be awarded to the owner is the difference between the fair market value of the cattle had the herd not been exposed to *harmful levels of electricity,* and the value of the dairy herd after the *harmful levels of electricity* ceased. . . . [9]

(Emphasis added.)

¶ 61.   The jury instruction was carefully tailored to match the special verdict questions. The instruction advised the jury eight times that damages due only to harmful electricity could be awarded.[10]

¶ 62.   While the special verdict did not ask whether the Gumzs were negligent in managing their

---

[9] The instruction is a modified version of Wis JI—Civil 1804/1806.

[10] We note that question 3 would have been better stated had the use of "and/or" been avoided. It is preferable to divide the question into separate inquiries rather than asking a compound question in a single inquiry. We do not conclude that the question was misleading or could have caused jury confusion such that a new trial is warranted here. *See Runjo v. St. Paul Fire & Marine Ins. Co.,* 197 Wis. 2d 594, 603, 541 N.W.2d 173 (Ct. App. 1995).

farm, neither did it allow that damages could be awarded for any injury due to their farm management. Similarly, the jury instruction explained repeatedly that damages were limited to damages from electricity. Thus, the special verdict was tailored to allow the Gumzs to recover for damages due to Northern States' negligence while preventing them from receiving any award for lost productivity due to their farm management.[11]

---

[11] The dissent inaccurately describes the positions of both the circuit court and the majority. The circuit court explicitly advised the jury that when considering damages, it could take into consideration the testimony regarding the Gumzs' farm practices. Thus, the circuit court instructed the jury to consider all of the evidence presented. Nevertheless, the dissent avers that the majority "provides no reason for excluding those matters from the jury's consideration." Dissent, ¶ 94. We provide no reason for excluding those matters from jury consideration because the jury did consider them, as the circuit court directed in the special verdict and jury instruction.

In addition, the dissent maintains that the jury should "consider all relevant harms causing damages and then detail its findings in the special verdict," and that "relevant harms" include lost productivity due to farm management. Dissent, ¶ 96. Surprisingly, the dissent cites as support a case in which the question of a plaintiff's contributory negligence was limited to whether the plaintiffs were negligent "in the design, mainte- nance, and operation *of their electrical equipment.*" *Vogel v. Grant-LaFayette Elec. Coop.,* 201 Wis. 2d 416, 420, 548 N.W.2d 829 (1996)(emphasis added). Further, it provides no reason for determining that the "relevant harms" include decreased pro- ductivity due to farm management rather than being limited to damages caused by electricity.

The dissent also maintains that limiting the contributory negligence question to electricity is an error of law and advo- cates the view that "a circuit court must ask a comparative negligence question, which is not limited to use of electricity,

¶ 63.   Nonetheless, Northern States contends that the circuit court's approach is erroneous. Relying on this court's decision in *Morgan v. Pennsylvania Gen. Ins. Co.*, 87 Wis. 2d 723, 275 N.W.2d 660 (1979), Northern States maintains that there can be multiple "causes in fact" of an injury and that the Gumzs' poor management of the farm is a "cause in fact" of the damages. Northern States argues that it is therefore entitled to a special verdict question on negligent management.

¶ 64.   Northern States' argument is unpersuasive. To begin, the primary case Northern States adduces for support is not on point. *Morgan* involved property damage caused by a motorist who ran into the plaintiff's trees. Following the advice of the motorist's insurance

---

unless it can determine as a matter of law that the plaintiff could not have contributed to the herd's condition." Dissent, ¶ 93. It reasons that if the plaintiffs are at least 51 percent negligent, then they are not entitled to recover at all. Dissent, ¶¶ 98–99, 101. The dissent simply assumes that whether the plaintiffs were at least 51 percent negligent pertains to all lost productivity. However, the scope of contributory negligence and whether the relevant harms in the case include all lost productivity are the very issues before this court. Thus, the dissent's approach merely begs the question.

Finally, despite advocating for an expansive comparative negligence question, the dissent expresses no similar concern for the scope of the jury instruction regarding damages. As discussed in the text, it is important that both the comparative negligence question and the damages were limited to electricity. Given that the circuit court defined the relevant damages as "damages attributable to harmful levels of electricity," it would be error for the contributory negligence question to address negligence other than that associated with electricity. The dissent's view appears to require a circuit court to both limit damages to those caused by electricity and then to divide any damage award by a percentage of comparative negligence not attributable to electricity.

adjuster, the plaintiff drove stakes into the ground next to the damaged trees for support. *Id.* at 728–29. In doing so, the plaintiff suffered a hernia. *Id.* The circuit court dismissed the complaint, but this court reversed. It determined that if the adjuster's conduct was a substantial factor in producing the injury, it could constitute cause-in-fact for the purpose of negligence. *Id.* at 735.

¶ 65. The issue presented here, however, is not whether poor farm management could be a substantial factor in producing an injury or whether there can be multiple causes in fact for an injury. Rather, the issue is whether the relevant inquiry in this case can focus narrowly on management of the electricity or must look more broadly at the Gumzs' management of their farm. *Morgan* provides no guidance whatever on that question.

¶ 66. Next, Northern States argues that it is entitled to a special verdict question on negligent management because the damages cannot be separated. It asserts that there is a single injury caused "concurrently" by electricity and the Gumzs' farm management, and that the Gumzs' management is therefore contributory to the damages sought. This argument is also unpersuasive. It is common in Wisconsin law that juries must differentiate damages due to the defendant's negligence from the plaintiff's prior condition or from damages caused by other parties.

¶ 67. For example, medical malpractice cases often require that juries separate the damages caused by a physician's negligence from damages that are "the result of the natural progression" of the condition or injury.[12]

_____

[12] Wis JI—Civil 1023; *see Fischer v. Ganju,* 168 Wis. 2d 834, 854, 485 N.W.2d 10 (1992)(allowing instruction requiring the jury "to separate the damages flowing from the defendant's

Where negligence aggravates a plaintiff's pre-existing injury, Wisconsin juries must separate out the prior injury and provide compensation only for the aggravation.[13] In enhanced injury cases, juries must distinguish damages from a plaintiff's initial accident from the damages caused by a defendant's actions that "produc[e] injuries over and above what probably would have been sustained in the [accident]."[14]

¶ 68. Similarly, the special verdict in the present case requires the separation of damages to the herd stemming from different conduct. The damages to the Gumzs' herd caused by Northern States' negligence may be "concurrent" with damages to the herd resulting from the Gumzs' management of their farm. Nonethe-

negligence and the damages flowing from [the plaintiff's] original physical condition"); *Young v. Professionals Ins. Co.,* 154 Wis. 2d 742, 749–50, 454 N.W.2d 24 (1990)(concluding that a jury instruction implying that there may be only one cause of an injury in a medical malpractice case is error).

[13] Wis JI—Civil 1710, Wis JI—Civil 1715, Wis JI—1720; *see Coryell v. Conn,* 88 Wis. 2d 310, 316, 276 N.W.2d 723 (1979) (upholding jury award for injury aggravating pre-existing condition despite "[t]he fact that the doctors could not specifically delineate the pain [plaintiff] claimed resulted from the accident, as opposed to the pre-existing" injury.); *Kablitz v. Hoeft,* 25 Wis. 2d 518, 523–25, 131 N.W.2d 346 (1964)(determining that the extent to which injury is attributable to accident and to pre-existing condition is an appropriate question for jury).

[14] Wis JI—Civil 1723; *see Sumnicht v. Toyota Motor Sales U.S.A., Inc.,* 121 Wis. 2d 338, 366, 360 N.W.2d 2 (1984) (upholding circuit court determination that there was sufficient evidence for jury to discern injuries plaintiff would have received in an accident if defendant's product had been properly engineered and those caused by defendant's defective product); *see also Farrell v. John Deere Co.,* 151 Wis. 2d 45, 60–62, 443 N.W.2d 50 (Ct. App. 1989).

less, the jury was required to assess damages attributable only to harmful levels of electricity.

¶ 69. Generally we accord wide discretion to the circuit court in framing the special verdict as long as it covers all issues of fact in the case and is consistent with the applicable principles of law. *Hegarty,* 297 Wis. 2d 70, ¶ 46. While we acknowledge that the circuit court could have framed the question more broadly, it was not required by the facts or law to do so here. Instead, the court exercised its discretion by carefully tailoring the questions to have a consistent focus. Both the negligence and damage questions were focused on electricity. Accordingly, we determine that the circuit court did not erroneously exercise its discretion in declining to give Northern States' proposed question regarding the contributory negligence of the Gumzs' management of their farm.

## V

¶ 70. Finally, we turn to Northern States' argument that the circuit court erred in refusing to limit damages only to those that occurred after Northern States had notice that stray voltage could be harming the Gumzs' cows. The Gumzs contend that Northern States has waived the issue under Wis. Stat. § 805.13(3) because it failed to raise it at the jury instruction conference.

¶ 71. Wisconsin Stat. § 805.13(3) provides in relevant part:

(3) Instruction and Verdict Conference

. . . .

The court shall inform counsel on the record of its proposed action on the motions and of the instructions

295

and verdict it proposes to submit. Counsel may object to the proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict.

¶ 72. In our review of the transcript of the jury instruction conference we could not discern that Northern States sought a special verdict question limiting damages. Further, our review indicates that Northern States did not raise an objection based on failure to limit damages. We therefore conclude that Northern States' failure to preserve the issue at the jury instruction conference constitutes a waiver under § 805.13(3).

¶ 73. This court has the discretion to review an issue that has been waived when it involves a question of law, has been briefed by the opposing parties, and is of sufficient public interest to merit a decision. *Apex Elecs. Corp. v. Gee,* 217 Wis. 2d 378, 384, 577 N.W.2d 23 (1998); *Wirth v. Ehly,* 93 Wis. 2d 433, 444, 287 N.W.2d 140 (1980). The present issue is one of law, the parties have briefed it, and stray voltage cases are of substantial public interest. We therefore address the issue to provide guidance to litigants in future cases.

¶ 74. Northern States contends that under *Snyder v. Oakdale Co-op Elec. Ass'n,* 269 Wis. 531, 69 N.W.2d 563 (1955), a utility is not required to inspect customer premises unless the utility has notice of a problem, and that a utility may be liable for damages only when it supplies electricity knowing of a condition that causes injury. *Snyder,* however, is inapt.

¶ 75. The plaintiff in *Snyder* requested electrical service from the defendant utility. An inspection report

filed with the defendant indicated that there were defects in the plaintiff's electrical system. However, the defendant provided service, causing a fire which damaged the plaintiff's property. *Id.* at 531–32. The court determined that a company providing electricity "for use in a private wiring system is not under obligation to inspect such system before supplying the current nor is it obligated to respond in damages for injuries sustained by reason of the defective condition of such system" unless the company knew of the defects. *Id.* at 533.

¶ 76.   Thus, *Snyder* concerns obligations of utilities in supplying electricity to defective private wiring systems. The present case, however, does not involve a defective private wiring system. Rather, the stray voltage causing damage to the Gumzs' herd came from Northern States' system. The fact that a utility must have notice of defects in private electrical systems in order to be responsible for damages is irrelevant to the question of whether notice is required for a utility to be responsible for damages caused by the utility's system.

¶ 77.   Moreover, Northern States' argument that it cannot be liable for negligence without notice of a problem understates the standard of care. As stated in the jury instruction, the electric company must exercise "ordinary care to discover any unsafe or defective condition of its distribution system . . . ." It is contradictory to predicate the requirement to exercise ordinary care in discovering unsafe or defective conditions in its distribution system on having notice of those unsafe or defective conditions.

¶ 78.   Northern States' argument is also inconsistent with *Kolpin, Allen,* and *Vogel v. Grant-Lafayette Elec. Coop.,* 201 Wis. 2d 416, 548 N.W.2d 829 (1996). In

each of those cases, utilities were found liable for damages caused by stray voltage, even though the utilities did not know that stray voltage from their systems was causing damage to the plaintiffs. *Kolpin,* 162 Wis. 2d at 11–14; *Allen,* 279 Wis. 2d 488, ¶¶ 3–7; *Vogel,* 201 Wis. 2d at 419–21. Consistent with these cases, we determine that the circuit court appropriately allowed damages to be awarded for the period before Northern States had notice that stray voltage from its system was harming the Gumzs' cows.

## VI

¶ 79.   In sum, we conclude that the circuit court did not erroneously exercise its discretion in the formulation of the special verdict. Following precedent, we determine that the circuit court did not err in failing to include in the special verdict a question addressing the statute of limitations. Based on the facts of this case, the circuit court correctly concluded as a matter of law that the Gumzs' action was not time barred because they had exercised reasonable diligence in discovering that stray voltage from Northern States' distribution system was a cause of damages to their herd.

¶ 80.   We also determine that the circuit court did not err in declining to give Northern States' proposed special verdict question regarding whether the Gumzs were contributorily negligent in the management of their farm. Finally, we determine that the circuit court appropriately allowed damages to be awarded for the period before Northern States had notice that stray voltage from its distribution system was harming the Gumzs' cows. Accordingly we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 81. ANNETTE KINGSLAND ZIEGLER, J. (*dissenting*). Two possible defenses—statute of limitations and contributory negligence—have not been considered by the jury even though the record contains competing evidence regarding those issues.

¶ 82. The majority opinion endorses the conclusion that the Gumzs were reasonably diligent in attempting to discover their injury and its cause and that no reasonable jury could have found otherwise. I respectfully disagree because competing inferences can be drawn from the record with regard to whether the Gumzs were reasonably diligent in attempting to discover their injury and its cause. A majority of this court further concludes that a comparative negligence question was unnecessary because special verdict questions were limited to inquiries regarding electricity. However, because the record contains facts that support both poor farm management and excess stray voltage as causes of the herd's poor health, the circuit court should have asked a comparative negligence question, which was not limited to use of electricity, in order to allow the jury to assess cause and damages fairly.

I

¶ 83. The relevant inquiry here pertains to whether the Gumzs, subject to a six-year statute of limitations, were reasonably diligent in discovering their injury and its cause, i.e., discovering excess stray voltage from Northern States, prior to December 21, 1995. In 1987, Northern States sent the Gumzs, as well as its other customers, general information about stray voltage including information about free investigation by Northern States, financial assistance from Northern States, and possible on and off-farm causes of stray voltage. In 1991, the Gumzs began to notice problems

with their herd. In 1992, Mr. Gumz hired a nutritionist to evaluate his herd, and Mr. Gumz inquired with the nutritionist about possible stray voltage problems on his farm. In 1993, the nutritionist eliminated any nutrition-related problems, and he told the Gumzs that they had a stray voltage problem and thus referred them to an electrician. In 1994, an electrician wired the barn addition and concluded that the Gumzs' on-farm wiring was very good. However, they did not ask the utility to conduct stray voltage testing until 1996 and did not file suit until December 21, 2001, despite a six-year statute of limitations.

¶ 84.   While a reasonable person could conclude that the Gumzs were reasonably diligent in their actions and did not discover their injury and its cause until after December 21, 1995, a reasonable person could also conclude that the Gumzs should have called the utility prior to December 21, 1995. A jury should have considered whether the Gumzs' chosen course was a reasonable process of elimination. A determination as a matter of law is not proper when reasonable inferences leading to conflicting results can be drawn from the undisputed facts. *See Cameron v. City of Milwaukee*, 102 Wis. 2d 448, 459, 307 N.W.2d 164 (1981).

¶ 85.   Unlike the plaintiffs in previous stray voltage cases, the Gumzs failed to contact the utility until long after they had concerns about stray voltage. In *Kolpin*[1] and *Allen,*[2] the plaintiffs asked the utility to test for stray voltage as part of the process of elimination. In those cases, the utility's testing indicated the

---

[1] *Kolpin v. Pioneer Power & Light Co. Inc.,* 162 Wis. 2d 1, 469 N.W.2d 595 (1991).

[2] *Allen v. Wisconsin Public Serv. Corp.,* 2005 WI App 40, 279 Wis. 2d 488, 694 N.W.2d 420.

farmer had no excess stray voltage from off-farm sources. Thus, the farmers continued to look elsewhere for a solution. In the case now before the court, the Gumzs did consult with an electrician, a nutritionist, a veterinarian, and had suspicions about stray voltage; however, they did not make an inquiry with the utility before December 21, 1995. One can receive the benefit of the discovery rule only if that person has been reasonably diligent in discovering the injury and its cause. *Spitler v. Dean,* 148 Wis. 2d 630, 638, 436 N.W.2d 308 (1989). Whether the Gumzs exercised reasonable diligence depends on a jury's view of the strategy they pursued prior to December 21, 1995.

¶ 86.   The majority asserts that the statute of limitations question falls squarely within the scope of *Kolpin* and *Allen. See* majority op., ¶ 28. This case, however, is distinguishable from those cases because the Gumzs did not ask the utility to test for stray voltage until long after they had concerns that stray voltage might be a problem on their farm. In *Kolpin,* the court determined that the plaintiffs did not know, nor should the plaintiffs have known with the exercise of reasonable diligence, their injury and its cause prior to February 17, 1981. *Kolpin,* 162 Wis. 2d at 27. Prior to this date, the Kolpins read articles about stray voltage, called their veterinarian, had experts evaluate their equipment, conducted their own voltage testing, called an electrician to conduct stray voltage testing, and called the utility company to conduct stray voltage testing. *Id.* at 12–13. There was no doubt as to whether the Kolpins were reasonably diligent at that time. Unlike the Gumzs, the Kolpins pursued possible electrical (on and off-farm) and non-electrical causes to their problems.

¶ 87.   In addition, information regarding stray voltage was not as prevalent in the 1980s, when the

Kolpins undertook these efforts.[3] We should recognize that the reasonable diligence analysis can change over time as the phenomenon of stray voltage becomes less elusive and more generally understood or recognized.[4]

¶ 88.   In *Allen,* the plaintiff suspected stray voltage in 1988 but did not file a lawsuit until 2000. Unlike the Gumzs, when the Allens had concerns about stray voltage, they called the utility company to conduct testing. *Allen,* 279 Wis. 2d 488, ¶ 3. When the utility company found no stray voltage problem, Allen looked to other possible avenues for relief, such as the cows' nutrition, on-farm electrical problems, and off-farm electrical problems. *Id.,* ¶ 13. Hence, *Allen* is distinguishable because, in *Allen,* the plaintiff promptly called the utility after there were indications and he had suspicions of stray voltage problems.

¶ 89.   The majority asserts that declining to follow the advice of a single non-expert does not demonstrate

─────────────────────

[3] The plaintiff in *Kolpin* undertook a diligent investigation to find the cause of his problem. It may be significant that the Kolpins did more than the Gumzs at a time when the stray voltage "phenomenon" may not have been as widely known. *See Kolpin,* 162 Wis. 2d at 12 (describing how neither the electrician nor the utility's representative knew how to test for stray voltage or how to read the measurements taken). *See also* R.D. Appleman and R.J. Gustafson, *Sources of Stray Voltage and Effect on Cow Health and Performance,* 68 J. Dairy Sci. 1554, 1554 (1985) (stating that *"[a]bout 1980,* problems from stray voltages were being identified throughout much of the U.S. and Canada")(emphasis added).

[4] *See* PSC Docket 05–EI-115, at 1–8 (updating the docket in 1996 in light of new research on stray voltage); *see also* R.D. Appleman and R.J. Gustafson, *Sources of Stray Voltage and Effect on Cow Health and Performance,* 68 J. Dairy Sci. 1554, 1565–66 (1985) (identifying several questions about stray voltage that remain unanswered).

a failure to exercise reasonable diligence. *See* majority op., ¶ 41. However, while a nutritionist alone may not be an expert in stray voltage, he or she may supply information worthy of consideration in the analysis.[5] Moreover, the record indicates that the Gumzs had more than just a single non-expert pointing them towards a stray voltage problem from off-farm sources. Their herd was sick, Northern States reportedly sent them information regarding stray voltage, Mr. Gumz inquired about stray voltage with his nutritionist, and an electrician concluded that their on-farm wiring was in good condition. Nonetheless, they waited two years from the electrician's conclusion that their on-farm wiring was in good condition before they contacted the utility to do off-farm testing.

¶ 90. The majority asserts that the Gumzs undertook a process of elimination, which is not subject to question. *See* majority op., ¶ 41. The Gumzs' efforts may be commendable; however, it is a jury question as to whether they exercised reasonable diligence in the discovery of stray voltage when they did not contact the utility company for approximately two years after the electrician's conclusion, three years after the nutritionist's conclusion, and four years after they became concerned about stray voltage.

---

[5] The majority opinion seems to assert that an expert opinion is required for discovery to occur and that failing to follow a non-expert's opinion cannot demonstrate a failure to exercise reasonable diligence. *See* majority op., ¶ 41. However, an expert opinion is not required for discovery to occur. *See Fritz v. McGrath,* 146 Wis. 2d 681, 690, 431 N.W.2d 751 (Ct. App. 1988) (concluding that an expert opinion is not a prerequisite to discovery). A farmer need only have what a court would conclude as an objective basis as to the injury and its cause. This may occur in a number of different ways, and it does not necessarily follow that an expert opinion is required.

¶ 91. The majority opinion seems to create or approve of a bright-line rule that discovery cannot occur in a stray voltage case until the farmer finds a remedy for the stray voltage problem. *See* majority op., ¶¶ 34, 37, 50–51. While in some stray voltage cases discovery may not occur until one finds a remedy, this is not always the case. A plaintiff need only have what a court would view as an objective basis as to the injury and its cause.[6] *Claypool v. Levin,* 209 Wis. 2d 284, 300, 562 N.W.2d 584 (1997).

¶ 92. Here, competing inferences can be drawn from the undisputed facts in the record about whether the Gumzs were reasonably diligent in discovering their injury and its cause. I make no determination as to whether the Gumzs were reasonably diligent or when discovery occurred; I merely conclude that the record does not support only one conclusion as a matter of law.

## II

¶ 93. The majority also concludes that the circuit court correctly declined to ask a comparative negligence question, which would have included the jury's consideration of the testimony it heard with regard to poor farm management practices.[7] The majority endorses the circuit court's limitation of the special verdict

---

[6] For example, if a farmer asks the utility to test for stray voltage and the utility finds excess stray voltage attributable to the utility, the plaintiff has likely discovered his or her injury and its cause. No reason exists for the exact remedy to be found, implemented, and successful before discovery could occur.

[7] The majority concludes that question three of the special verdict, which can be found in ¶ 59 of the majority opinion, is problematic—but not an error—because the circuit court was addressing only negligence in question three and not the statute of limitations. *See* majority op., ¶¶ 46–49. Because I conclude

304

questions, which addressed only those damages arising out of electricity, rather than a question that would have addressed all of the evidence presented. *See* majority op., ¶ 68. The majority can only reach the result it sets forth by refusing to give the jury a question based upon the testimony presented. Because of the testimony in this case, I disagree with the majority and conclude that a circuit court must ask a comparative negligence question, which is not limited to use of electricity, unless it can determine as a matter of law that the plaintiff could not have contributed to the herd's condition. To conclude otherwise may lead to an economic windfall for the plaintiff because it could eliminate the jury's response to a significant defense.

¶ 94.    The majority opinion approves of the circuit court's decision to withhold Wis. Stat. § 895.045(1) (2005–06), Contributory negligence—as it pertained to poor farming practices—from the jury's consideration. In the case at issue, the jury heard testimony about poor farm management, and it heard evidence that the Gumzs' farm practices contributed to the poor health of the herd.[8] Despite that evidence, the majority opinion provides no reason for excluding those matters from the jury's consideration.

that the circuit court should have given a statute of limitations question, I conclude special verdict question three is deficient. However, I agree with the majority's conclusion in ¶¶ 46–49; circuit courts should separate questions addressing statute of limitations and negligence.

[8] Relevant testimony of Northern States' expert, Dr. Richard Huston:

Q:   Do you have an opinion to a reasonable degree of certainty as to whether or not this herd is adversely affected by electricity?

A:   Yes, I do.

Q:   What is your opinion?

¶ 95. The jury heard evidence from Northern States' expert, Dr. Huston. He identified several problems on the Gumzs' farm, besides the alleged stray voltage, that caused poor milk production. Dr. Huston testified that the Gumzs were responsible for the herd's low milk production in the following ways: (1) poor bio-security in that the Gumz did not properly isolate new animals coming to the farm, used dirty needles, did not wear rubber gloves, and failed to disinfect milking equipment between cows; (2) poor feeding practices because of low relative feed value of hay, lack of food in front of cows, and no transition ration; (3) poor record keeping such as no reproduction records and no individual records for cows; (4) poor breeding practices because the Gumzs used inexpensive bulls, untested bulls, and a bull with physical defects that were not conducive to producing good animals; (5) poor cow comfort because the Gumzs used stanchion stalls instead of tie stalls, and no bedding such as sand or straw; and (6) inconsistent milking practices among workers. Based on the verdict submitted to the jury, we can only speculate as to what the jury may have done with this information.

---

A: That it was not.

Q: Why do you say that, Dr. Huston?

A: Well, for multiple reasons. First of all, what we're looking at up there, if you're going to have a stray voltage problem, you would expect things to get better, and they do. I've seen that many times, that things get better when you correct the problem. So that would be the purest and most simple answer.

*In addition to that, there's a lot of management things that have gone on in this farm that are contributing to the production levels that are in place and have been in place throughout this entire period of time.*

(Emphasis added.)

¶ 96. The majority opinion assumes that a jury will appropriately focus only on "electrical" damages and thus reduce the total damages to only those due to electrical problems. However, to allow for appropriate judicial review and a fair verdict, it is a better practice for the jury to consider all relevant harms causing damages and then detail its findings in the special verdict. For example, in another stray voltage case, *Vogel v. Grant-Lafayette Electric Cooperative,* the defendant-utility argued the plaintiffs were negligent in design, maintenance, and operation of their electrical equipment. *Vogel v. Grant-Lafayette Elec. Coop.,* 201 Wis. 2d 416, 420, 548 N.W.2d 829 (1996). The jury awarded $300,000 in damages and found the Vogels were one-third negligent. *Id.* at 421. The circuit court appropriately reduced the damage award by one-third to $200,000. *Id.*[9]

¶ 97. The outcome of the case at hand illustrates why a jury must consider both the plaintiff and defendant's conduct. Northern States claims the Gumzs

---

[9] The circuit court's action on contributory negligence was not called into question in *Vogel.* However, it is seemingly common practice to allow such apportionment. *See Fox v. Interstate Power Co.,* 521 N.W.2d 762, 764 (Iowa Ct. App. 1994) (finding that the jury's apportionment of fault, 80 percent to plaintiff-farmer and 20 percent to defendant-utility, was supported by the record because the evidence showed poor biosecurity such as failing to wash hands, sanitize milking equipment between cows, provide clean environment for cows, and the farmer failed to keep mastitis records); *Case v. Consumers Power Co.,* 615 N.W.2d 17, 19 (Mich. 2000) (stating that the jury heard evidence on stray voltage and problems on the plaintiff's farm, and it found the plaintiff-farmer 55 percent at fault and thus the defendant-utility 45 percent at fault); *Otte v. Dayton Power & Light Co.,* 523 N.E.2d 835, 837–38 (Ohio 1988) (stating that the jury found the plaintiff-farmer 49 percent at fault and the defendant-utility 51 percent at fault).

were negligent in the management of their farm, which led to decreased milk production and poor herd health. Northern States produced evidence and testimony at trial to support its assertion. On the other hand, the Gumzs claimed their problems were due to stray voltage from Northern States. An agricultural economist testified that the total economic damages due to lost productivity were $901,183.

¶ 98. However, the jury awarded only about one-half of that requested figure, $532,336. Why? Did the jury conclude that the Gumzs' farm practices contributed to the herd's harm in that percentage? Did the jury award the entire amount for lost productivity that it thought was proven by the evidence? What did the jury do, if anything, with the information regarding poor herd management? We do not know why the jury awarded about half of what the Gumzs requested. This case illustrates that the respective responsibility for negligence may be close to that critical 51 percent threshold, which could result in Wis. Stat. § 895.045, Contributory negligence, barring or reducing the plaintiffs' damage award.

¶ 99. Consider the following hypothetical: A dairy herd is harmed because of both electricity—i.e., stray voltage from the utility—and poor farm practices by the farmer. Damages total $100,000 and the plaintiff is 75 percent at fault due to poor farm management, while the defendant is 25 percent at fault for providing stray voltage. Under this scenario, if the comparative negligence question is not asked, the plaintiff recovers $100,000, but if the comparative negligence question is asked, the plaintiff recovers nothing.

¶ 100. One may argue that if the special verdict questions address only electricity, the jury awards damages only arising out of electricity. E.g., under the above

hypothetical, $25,000. However, this may not be the appropriate legal outcome if a plaintiff is more responsible for the harm than the defendant. As a result, the circuit court should have given a comparative negligence question to the jury that was not limited to the use of electricity: an overall damages question and then calculate damages accordingly.

¶ 101. To allow for appropriate judicial review, a jury must consider the different causes and specify on the special verdict each party's responsibility, if any, for the harm. Allowing a jury to focus narrowly on electricity may create an economic windfall for the plaintiff, unless the court determines as a matter of law that the plaintiff could not have been negligent. Moreover, while a verdict limiting the inquiry to electricity does account for the utility's negligence with respect to stray voltage, it does not account for a defense relating to the owners' negligent treatment of the herd. Finally, it leaves the jury without an adequate accounting of its reaction to the testimony concerning the plaintiffs' farm practices. These issues directly relate to cause and damages; thus, they are important for a jury to assess.

¶ 102. The Gumzs' lawsuit is distinguishable from a medical malpractice lawsuit. In a medical malpractice suit, a jury must distinguish and separate the natural result in damages that flow from the plaintiffs' original injury from the damages that naturally resulted from the doctor's treatment. See Wis JI—Civil 1023. In a medical malpractice action, the court instructs the jury to "entirely exclude" from its consideration "all damages which resulted from the original injury" and consider only the damages plaintiff sustained because of the treatment by the doctor. *Id.* Here, we have no original injury to exclude. Rather, we have two competing, simultaneous causes for the same harm—lost milk production.

¶ 103. In medical malpractice, the jury is instructed to find that the doctor's negligence was a cause of the present condition if it concludes that the present condition was caused jointly by the doctor's negligence and the natural progression of the plaintiff's injury. *Id.* We have no "natural progression" of the plaintiff's injury in this case. Rather, the evidence seemingly supports two competing, simultaneous causes for the herd's health problems. The testimony in this case supported the possibility that both the farmer and the utility contributed to the injury. The majority decision eliminates the traditional assessment of negligence and damage that has stood the test of time in tort law. I would not carve out such a niche in stray voltage cases.

### III

¶ 104. Two possible defenses—statute of limitations and contributory negligence—have been taken from the jury's consideration. Because competing inferences can be drawn from the undisputed facts in the record about whether the Gumzs were reasonably diligent in discovering their injury and its cause, the statute of limitations issue should not have been determined as a matter of law. Moreover, because the record contains facts that could support both poor farm management and excess stray voltage as causes of the herd's poor health, the circuit court should have asked a comparative negligence question, which was not limited to electricity, in order to allow the jury to assess cause and damages fairly.

¶ 105. For the foregoing reasons, I respectfully dissent.

¶ 106.   I am authorized to state that Justices DAVID T. PROSSER and PATIENCE DRAKE ROGGENSACK join this dissent.